FILED

08/10/2018

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

September 7, 2017 Session

## STATE OF TENNESSEE v. MAURICE BAXTER aka MAURICE GROSS

Appeal from the Criminal Court for Shelby County
No. 13-03895     James C. Beasley, Jr., Judge

———————————————————

### No. W2016-01088-CCA-R3-CD

———————————————————

A Shelby County Criminal Court Jury convicted the Appellant, Maurice Baxter, of aggravated rape, aggravated burglary, and theft of property valued more than $1,000, and he received an effective sentence of fifty-eight years in confinement. On appeal, the Appellant contends that the evidence is insufficient to support the convictions, that the trial court erred by allowing the jury to hear that his DNA profile was in the CODIS database, that the trial court erred by allowing the defense's DNA expert to testify for the State, and that the State committed prosecutorial misconduct during its rebuttal closing argument. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the defense expert's testifying for the State constitutes reversible error. We also conclude that the State committed prosecutorial misconduct and that the cumulative effect of that error further warrants reversal. Accordingly, the Appellant's convictions must be reversed and the case remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which J. ROSS DYER, J., joined. Thomas T. Woodall, J., filed a separate concurring opinion.

Lance R. Chism (on appeal) and Eugene Belenitsky (at trial), Memphis, Tennessee, for the appellant, Maurice Baxter.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Joshua Corman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

# I. Factual Background

In August 2013, the Shelby County Grand Jury indicted the Appellant for aggravated rape, a Class A felony; aggravated burglary, a Class C felony; employing a firearm during the commission of a dangerous felony, a Class C felony; and theft of property valued more than $1,000 but less than $10,000, a Class D felony. At trial, the victim testified that she was sixty-seven years old, that she had lived in her home on Canary Lane in Memphis for more than forty-five years, and that she had three grown children and eight grandchildren. On the night of July 27, 2012, the victim and her granddaughter went to a play at a church. After the play, the victim dropped off her granddaughter at her granddaughter's house and drove home.

The victim testified that when she arrived home, she noticed that the lights in her house were on. The victim lived alone but thought her daughter was there. She left her purse in her car, went inside, and called her daughter's name but did not hear anything. She said that she walked down the hall, that a man with a black handgun came around the corner, and that he told her, "[S]hut up, [b****]." The victim stated that a second man walked past her and that he was carrying a pillowcase "full of stuff." The second man went outside, took the victim's purse out of her car, and left.

The victim testified that she never saw the second man again but that the first man stayed in her house. She said that she kept "calling Jesus" and that the man kept telling her, "[B****], be quiet." He forced her into the guest bedroom and told her to get onto the floor and take off her clothes. The victim got onto the floor, and the man kicked her head. The victim stated that she thought he was going to kill her and that she did what she was told. The victim took off all of her clothing, and the man put his fingers in her vagina. The victim told him to stop and that she was old enough to be his mother. She also told him that she had HIV in hopes that he would stop penetrating her, but he did not stop. When he finished, he made her go to the front of the house. The victim said that he sat on the couch and told her to "suck his [d***]." He forced her head onto his penis, and his penis went into her mouth. He then told her to get onto the floor, pulled down his pants, and penetrated her vagina with his penis. The victim said that he did not ejaculate during the oral sex and that she did not know if he ejaculated when he penetrated her vagina.

The victim testified that the man got off her; that he told her, "I got to wipe my fingerprints off everything"; and that he "turned his shirt up and went to wiping stuff down." The victim, who was still naked, asked if she could get a robe, and he allowed her to do so. He asked her where her car keys were located, and she told him they were in her car. The victim said that she lied to him and that her keys were under her clothes in the guest bedroom. The man went outside and got into the victim's car, and she ran to

a neighbor's house. The victim knocked on her neighbor's door and saw the man running down the street. The victim's neighbor let her inside and telephoned the police.

The victim testified that both of the men were African-American. She described the first man with the gun as "a young guy" and "dark skinned" and said he was wearing jeans with large back pockets. The logo "Coolie" or "Cool J" was on the back of his pants, and the same logo was on his shirt. He also was wearing a white baseball cap. The second man had the pillowcase and was wearing a green shirt.

The victim testified that the police arrived and that she told them what had happened. She and the police walked through her house, and she discovered that gold jewelry, three DVD players, and DVDs were missing. Her Dooney and Bourke purse, which contained two cellular telephones, was missing from her car. After the victim spoke with the police, she went to the Rape Crisis Center. On July 30, a police officer showed her a six-photograph array, and she wrote on one of the photographs that "he looks like the man." However, she could not make a positive identification. On August 2, a police officer showed the victim a second six-photograph array, and she wrote on one of the photographs that "this looks like the person." Again, though, she could not make a positive identification. On February 8, 2013, a police officer showed the victim a third six-photograph array, but she was unable to make a positive identification.

On cross-examination, the victim testified that she had arrived home from the play by 10:30 p.m. and that the police came to her home about 11:15 p.m. She acknowledged that she was with the first man for thirty-five to forty minutes and that the lights were on in her house the entire time. She said she was familiar with her neighborhood but not all of her neighbors.

Josiah Barnes, the victim's neighbor, testified that on the night of July 27, 2012, the victim came to his home and told him to call the police. She was upset and crying and said she had been raped, hit on the head, and robbed. Barnes went outside, walked toward the victim's house, and looked down the street but did not see anyone. He and his wife telephoned the police.

On cross-examination, Barnes testified that the victim knocked on his door between 9:00 and 10:00 p.m. He said he was sure it was not past 10:00 p.m. because "the news was getting ready to come on and that's when we decided to go to bed." The police arrived fifteen to twenty minutes later.

Sergeant Sharon Kelley of the Memphis Police Department (MPD) Special Victims Sex Crime Unit testified that on September 27, 2012, she was dispatched to the victim's residence and spoke with the victim. Two men had been in the victim's home.

- 3 -

The victim was unable to get a good look at one of them because he ran out the back door as soon as she came into the house. The victim said one of the men had sexually assaulted her on the couch and on the carpet in front of the couch, so the police collected a sample of the carpet for testing. They also collected fingerprints from the home, but none of the prints were of value.

Sergeant Kelley testified that she took a statement from the victim at the Rape Crisis Center. A nurse collected evidence for a rape kit, and Sergeant Kelley transported the kit to the MPD's property room. Police officers located three suspects who were known burglars in the victim's neighborhood and collected DNA samples from them. The samples were sent with the victim's rape kit to the Tennessee Bureau of Investigation (TBI). Sergeant Kelley showed a photograph array to the victim on July 30, 2012, but she could not make a positive identification.

Sergeant Kelley testified that in February 2013, the TBI notified her that "there was a CODIS match on the sexual assault kit." She acknowledged that "CODIS" was the acronym for Combined DNA Index System and that CODIS identified the Appellant as the match. Sergeant Kelley prepared a photograph array containing the Appellant's photograph and showed it to the victim, but the victim did not identify anyone. Sergeant Kelley obtained a search warrant for the Appellant's DNA, collected a buccal swab from him, and sent the swab to the TBI. The TBI confirmed that the Appellant's DNA matched the DNA in the victim's rape kit.

On cross-examination, Sergeant Kelley acknowledged that the victim picked a man's photograph in the first array on July 30 and that "sources" in the neighborhood had identified him as the man who may have raped the victim. The police did not find a gun at the victim's home, and Sergeant Kelley did not recall seeing any injuries on the victim's face or head. The Appellant's mother lived on the same street as the victim. On redirect examination, Agent Kelly testified that the street address on the Appellant's driver's license was "somewhere in the 1100 block" of Canary Lane.

Sally DiScenza, a forensic nurse examiner at the Rape Crisis Center, testified as an expert in forensic identification that she examined the victim on July 28, 2012. The victim told DiScenza the following: The victim "came home to a home invasion robbery by two unknown African American males between 25 and 35 years of age." The "shorter" of the two men forced the victim to go into the guest bedroom and take off her clothes. He kicked her on the forehead twice and began fondling her with his hands. He then took the victim into the living room and told her to "suck his [d***]." The victim told him that she "didn't know how to do this." He shoved his penis into her mouth, and the victim started gagging. He pushed the victim onto the floor and penetrated her vagina

- 4 -

with his penis. The man did not ejaculate during the oral sex, but the victim did not know if he ejaculated during the vaginal penetration.

DiScenza testified that the victim was cooperative and answered her questions "right away." The victim complained of abdominal pain and pain to her left elbow, and DiScenza saw swelling on the victim's left elbow. DiScenza saw redness at the entrance to the victim's vaginal area, which was consistent with the victim's having been raped, and collected swabs from the victim's internal and external vaginal areas for a rape kit. DiScenza said that she concluded her examination of the victim at 4:15 a.m. and that she gave the victim's rape kit to Sergeant Kelley. On cross-examination, DiScenza acknowledged that she did not see any injuries, such as bruising, on the victim's head. She said, though, that it was not unusual not to see bruising on African-American females.

Lawrence James, a special agent forensic scientist with the TBI, testified as an expert in DNA analysis that he analyzed oral swabs and "vaginal swabs" in the victim's rape kit for the presence of semen. He found semen and sperm on the vaginal swabs but not the oral swabs. Agent James obtained a DNA profile from the sperm, compared it to the DNA of three men submitted with the kit, and excluded the three men as contributors. He then submitted the DNA profile from the sperm to CODIS, the FBI's DNA database. In February 2013, he learned there had been a "hit" in CODIS. The name, date of birth, and social security number for the person in the database matching the sperm DNA profile in the victim's rape kit were those of the Appellant. Agent James contacted Sergeant Kelley and told her that he needed a DNA sample from the Appellant. He received the sample, obtained a DNA profile from it, and compared it to the DNA profile for the sperm in the rape kit. The profiles matched. Agent James said the odds of another person having the same profile as the Appellant exceeded the world's population.

On cross-examination, Agent James testified that he was not certified by the American Board of Criminalistics. Defense counsel asked if he had ever contaminated any samples, and he estimated that he had contaminated four samples with his own DNA "during allergy season." The victim's rape kit contained three vaginal swabs and four vulvar swabs. Agent James acknowledged that he referred to all seven swabs as "vaginal swabs" in his report and stated that "the term vaginal swab is collective of vaginal and vulvar." He acknowledged, though, that "vaginal" and "vulvar" had different meanings and that "vaginal" referred to internal female genitalia while "vulvar" referred to external female genitalia. Agent James analyzed all seven swabs for the presence of semen, and all seven tested positive. At that point, he decided to conduct DNA analysis only on the vulvar swabs because "there's less victim DNA on a vulvar swab than there is on a vaginal swab . . . so I figured I would get a cleaner [DNA] profile from the vulvar swabs and that's what happened." He acknowledged that he did not know what DNA profile he

would have obtained from the victim's vaginal swabs but said that "my experience is that pretty frequently you don't get separate results from vaginal versus vulvar swabs."

On redirect examination, Agent James testified that he received some of the victim's carpet for testing. He did not analyze the carpet because he already had obtained a male DNA profile from the swabs in the rape kit.

George Schiro testified as an expert in DNA analysis that he was the Lab Director for Scales Biological Lab, a private DNA testing facility in Brandon, Mississippi, and that he was certified by the American Board of Criminalistics. He said that certification was not required and that "probably a small segment" of DNA analysts were certified.

Schiro testified that he received the victim's oral, vaginal, and vulvar swabs in January 2016 and tested the vaginal and vulvar swabs in February 2016. He found semen on both sets of swabs. The DNA profile for the sperm on the vulvar swabs matched the Appellant's DNA profile. On the victim's vaginal swabs, Schiro found a mixture of at least two DNA profiles. He could not exclude the Appellant or the victim as contributors to the mixture but excluded 99.99 percent of the population as contributors. He acknowledged that the TBI had already tested the evidence when he received it and said that he was not concerned the TBI had contaminated the evidence.

On cross-examination, Schiro testified that he reviewed Agent James's report. In the report, Agent James provided analysis results for "vaginal swabs." According to Agent James's notes, though, he tested only the vulvar swabs. Schiro said that given that the victim had reported vaginal penetration, "the internal vaginal swabs to me would be the most important." Defense counsel asked, "[H]as DNA been wrong in the past?" Schiro answered that "there have been instances where there has been cross contamination. Referenced samples sometimes switched, that sort of thing. So I guess the technology itself wasn't wrong, but it was due -- you know, there have been errors in DNA analysis because of usually -- typically human errors." He said that he had testified in prior cases, usually for the State, and acknowledged that his testimony earned income for Scales Biological Lab. At the conclusion of Schiro's testimony, the State rested its case.

Sergeant Marlon Wright of the MPD testified for the Appellant that he showed two photograph arrays to the victim on August 2, 2012. He said that the victim selected a photograph in one of the arrays but that "she was not a hundred percent sure." The victim wrote on the photograph that "this looks like the person," and the person she identified was a suspect in the case. On cross-examination, Sergeant Wright testified that he did not consider the victim's identification to be a "positive" identification.

At the conclusion of Sergeant Wright's testimony, the trial court required that the State make an election of offenses for the aggravated rape charge, and the State elected the Appellant's penetrating the victim's vagina with his penis. Subsequently, the jury found the Appellant guilty as charged of aggravated rape, aggravated burglary, and theft of property valued more than $1,000 but found him not guilty of possession of a weapon during the commission of a dangerous felony. During a sentencing hearing, the trial court sentenced him as a Range II, multiple offender to forty years[1], ten years, and eight years, respectively, for a total effective sentence of fifty-eight years.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support his convictions because the State failed to prove he was the perpetrator. In support of his claim, he notes that DNA evidence alone is not always sufficient to support a conviction, that the victim never identified him as the perpetrator despite being with her attacker for a lengthy period of time in a well-lit house, and that she said two other men looked like her attacker. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

---

[1] The trial court noted that the Appellant was required to serve the forty-year sentence at one hundred percent. See Tenn. Code Ann. § 40-35-401(i)(1), (2)(F).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

This court has held that DNA evidence alone can be, but is not always, sufficient to support a conviction. See State v. Toomes, 191 S.W.3d 122, 130-31 (Tenn. Crim. App. 2005). Granted, the victim in this case was unable to identify the Appellant as the perpetrator. However, when the DNA profile of the sperm in the victim's rape kit was submitted to CODIS, it matched the Appellant's profile. Sergeant Kelley then obtained a buccal swab from the Appellant, Agent James developed a DNA profile from the swab, and the DNA profile of the sperm in the victim's rape kit again matched the Appellant. Moreover, the Appellant's mother lived on Canary Lane, the same street as the victim, and the Appellant's address on his driver's license was "Canary Lane." Therefore, we conclude that the evidence is sufficient to identify the Appellant as the perpetrator of the crimes.

## B. CODIS Database

Next, the Appellant contends that the trial court erred by allowing the jury to hear that his DNA profile was in the CODIS database. He claims that the evidence violated Tennessee Rule of Evidence Rule 403 because there was no need for the State to inform the jury that his profile was in the database; therefore, the probative value of the evidence was low and substantially outweighed by the danger of unfair prejudice. He also claims that the evidence violated Tennessee Rule of Evidence 404(b) because "the jury, no doubt, concluded that [he] had a history of criminal convictions and/or arrests." The State argues that the trial court did not err. We agree with the State.

Before trial, the Appellant filed a motion in limine pursuant to Tennessee Rules of Evidence 403 and 404(b), requesting that the trial court exclude any references "to Defendant being in the CODIS." During a hearing on the motion, defense counsel argued that the State's referring to the Appellant's DNA profile being in the database "would tell the jury that the defendant has a felony conviction." The State advised the trial court that it was not aware of any case law that prohibited a reference to CODIS and that it was not going to tell the jury that CODIS was a DNA database for convicted felons. The trial

court granted the Appellant's motion "to the extent that there's a reference to where the information in CODIS comes from" but denied the motion "as to the fact that it was retrieved from the CODIS system."

The State and its witnesses mentioned CODIS several times at trial. During its opening statement, the State told the jury that "they put it into a database called CODIS, and, from that database, they get a hit, a hit that comes back to the Defendant." On direct examination, Sergeant Kelley testified that the TBI notified her that "there was a CODIS match on the sexual assault kit," and Agent James testified that CODIS was "the FBI's DNA database[.]" During closing arguments, the State argued that Agent James put the DNA profile from the rape kit "in the CODIS database" and "gets a hit."

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

> The determination of whether proffered evidence is relevant in accordance with Tenn. R. Evid. 402 is left to the discretion of the trial judge, State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995), as is the determination pursuant to Rule 403, Tenn. R. Evid., of whether the probative value of evidence is substantially outweighed by the possibility of prejudice. State v. Burlison, 868 S.W.2d 713, 720-721 (Tenn. Crim. App. 1993). See also State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). In making these decisions, the trial court must consider the questions of fact that the jury will have to consider in determining the accused's guilt as well as other evidence that has been introduced during the course of the trial. Williamson, 919 S.W.2d at 78.

State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999).

Generally, a party may not introduce evidence of an individual's character or a particular character trait in order to prove that the individual acted in conformity with that character or trait at a certain time. Tenn. R. Evid. 404(a). Similarly, evidence "of other

crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence may be admitted for other purposes, though, if relevant to some matter actually at issue in the case and if its probative value is not outweighed by the danger of its prejudicial effect. Tenn. R. Evid. 404(b); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Issues to which such evidence may be relevant include identity, motive, common scheme or plan, intent, or the rebuttal of accident or mistake defenses. Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Before the trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Provided that the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The Appellant contends that the probative value of any references to CODIS was low because "the State could have simply told the jury that [he] was developed as a suspect and that his DNA was obtained." We disagree. The State's case was based almost entirely on the fact that the DNA in the victim's rape kit matched the Appellant's DNA. Therefore, the jury's hearing that the DNA in the kit matched the Appellant's DNA in CODIS and then again during independent testing by Agent James was extremely probative, especially when part of the Appellant's defense was that the DNA analysis conducted by Agent James was unreliable. Moreover, nothing indicates that the jurors had any knowledge about CODIS. Although Agent James stated that CODIS was "the FBI's DNA database," information in an FBI database does not necessarily impute

criminality.[2]  The State did not present any evidence as to how the Appellant's DNA profile ended up in the database or that the Appellant had engaged in prior bad acts. Accordingly, we conclude that the jury's hearing that the Appellant's DNA profile was in CODIS did not violate Tennessee Rules of Evidence 403 or 404(b) and, therefore, that the trial court did not abuse its discretion.

## C.  Defense Expert

The Appellant contends that the trial court erred by allowing his DNA expert to testify as a witness for the State.  The State argues that the trial court did not err.  We conclude that the trial court committed reversible error.

On August 25, 2015, the assistant public defender representing the Appellant obtained an ex parte order to hire a DNA expert.  On October 1, 2015, the trial court filed a consent order, directing that the State and the TBI deliver all DNA testing samples and reports to defense counsel.  On March 21, 2016, seven days before trial, the Appellant filed a motion to prohibit its DNA expert, George Schiro, from testifying as a State witness.[3]  In the motion, defense counsel advised the trial court that Schiro was not going to testify for the Appellant at trial but argued that Schiro's testifying for the State would violate Tennessee Rule of Criminal Procedure 16(b) and the work product doctrine.

During a pretrial hearing that same day, defense counsel advised the trial court that the State was trying to subpoena Schiro, and the State responded as follows:

> Judge, it's basically this is what happens when you consult an expert and you don't get the answer you want.  Now they turned into a witness for the State.  That's exactly what happened.
>
> That's what we talked about before we ever did this. You understand what will happen if the expert comes back and says that's the DNA and this was done properly, then

---

[2] We note that the FBI also maintains a fingerprint database.  "Categories of fingerprints currently maintained in the Fingerprint Identification Record System (FIRS) includes:  criminal fingerprints, federal applicants and employees, United States military, aliens, and those submitted to the FBI by persons desiring to have their fingerprints placed on record for personal identification purposes."  Privacy Impact Assessment: Integrated Automated Fingerprint Identification System National Security Enhancements, Fed. Bureau of Investigation, https://www.fbi.gov/services/records-management/foipa/privacy-impact-assessments/iafis (last visited August 3, 2018).

[3] During oral arguments, defense counsel advised this court that Schiro's name may have been revealed to the State when the victim's rape kit was shipped to Schiro for testing.

now we're going to use them. And basically, that's what's happened in this case.

The trial court agreed with the State, saying, "You consulted an expert who apparently must say yeah, that's his DNA. So I don't know what else -- I don't understand the conflict." The court determined that as long the State did not ask Schiro if he had been hired by the defense, Schiro could testify for the State.

Just prior to Schiro's testimony at trial, the trial court held a jury-out hearing regarding the expert's testimony. During the hearing, Schiro testified that defense counsel contacted him about working on the Appellant's case and that "[i]nitially it was review of [the] TBI crime labs case folder and their reports and then some evidence was submitted to our lab for testing." Schiro also helped defense counsel prepare for cross-examination of the State's expert, advised defense counsel about trial strategy, aided the defense in understanding the State's case, and alerted defense counsel to weaknesses in the State's case. Schiro said that he last spoke with defense counsel "late last week sometime. Maybe last Friday." He acknowledged that he also emailed something to counsel "over the weekend" and that he continued to help the defense after the State contacted him about testifying.

Regarding the State's wanting to call him as a witness, Schiro testified that he "felt it was unusual" and that he had "never been put in that situation before." He said that the State had asked him to testify but that he would not do so if he did not have to. The State did not "pressure" him to testify or subpoena him to trial, and the trial court did not order him to appear. Defense counsel then asked, "But if the court told you that you're not under any order and you could leave, would you leave even though the state wants you to be here?" Schiro answered, "Probably not." Defense counsel asked if the State was paying him to give his opinion, and he answered, "They paid me for my time today."

The State then questioned Schiro as follows:

> Q.     When we first spoke to you and consulted with you, we made clear that anything that you and defense counsel had discussed was not something we were going to discuss at all, is that correct?
>
> A.     That's correct.
>
> Q.     And I tried to make clear that that wasn't something that would be discussed during the trial either. So either me just speaking to you and preparing for trial or the questions

we were going to ask you at trial would not have anything to do with any discussions or anything you may have done for the defense, is that correct?

A.      No direct discussions, that's correct.

Q.      Okay.  And I, I guess tried to make clear, the questions we asked at trial would not get into the fact that you had been originally retained for -- by the defense and requested to do things by the defense, that wasn't something we were going to discuss at all and you understood that wasn't -- your testimony was not to ever reveal that, is that right?

A.      Yes, that's correct.

At that point, defense counsel questioned Schiro as follows:

[Defense counsel]: . . . Did you discuss with the state the distinction between vulvar swabs and vaginal swabs?

THE WITNESS:  We may have discussed that.  The question was posed to me by the state asking if there was anything unusual that I found in [the] TBI's reports.

[Defense counsel]:  And that's exactly what you prepared the defense for, isn't that right?

THE WITNESS:  Yes, that's correct.

[Defense counsel]:  To point those errors out for the jurors, that was the strategy advice, isn't that right?

THE WITNESS:  Yes, that's correct.

[Defense counsel]:  Okay.  And then did you volunteer that to the state or in response to a question?

THE WITNESS:  Well, the question was, was there anything unusual I found when I reviewed [the] TBI's reports and data.  And I said that in my opinion, they had reported out as vaginal swab that was actually vulvar swab results.

- 13 -

[Defense counsel]: And when was that discussion taking place with the state?

THE WITNESS: I believe it was last week sometime but I don't know.

. . . .

[Defense counsel]: And after that, did you then email the defense cross examination questions that you proposed the defense ask the state witness?

THE WITNESS: Yes.

[Defense counsel]: That you proposed the defense ask the state witness?

THE WITNESS: Yes.

[Defense counsel]: And did those questions involve vulvar and vaginal swab questions?

THE WITNESS: Yes. And I made it clear to the state that I was continuing to consult with the defense in this case.

The trial court asked the State what it was proposing to ask Schiro on direct examination, and the State said it was going to ask if he tested the evidence in the victim's rape kit and the results of the tests. The State then said that, based on Agent James's testimony, it also would question Schiro about the American Board of Criminalistics and "any evidence of contamination that [caused] him concern[.]" The trial court ruled as follows:

I think all that's proper, and would be proper whether you called him or whether the defense called him or the state called him, I think that would all be proper and quite frankly, I don't see anything wrong with the state interviewing a defense witness that's going to testify. [If] the witness wants to talk to the state he has a right to do that, he has a right not to. I don't -- I haven't heard or had any indication that there's any violation of any ethical standards by Mr. Schiro with

- 14 -

regard to communications with the defense. Specific information. If he's going to be an expert that's going to be used, I think the state has a right to question him, and in this case, the state has a right to call him as well. I don't think he can be asked questions that deal with his individual conversations with defense counsel and information provided to defense counsel as part of the work product for defense counsel, but since he was asked to analyze the samples and do his own independent testing and to review what he saw the TBI work was done, to me, either side can call him to gather that information, and I don't think that he's in any way violating any trust for the defense. So I don't have a problem with it.

We will not overturn a trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion. State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). In State v. Larkin, this court addressed a defense expert's "switching sides" to testify for the prosecution. 443 S.W.3d 751, 793 (Tenn. Crim. App. 2013). In that case, the defense originally retained the expert to render a professional opinion about the victim's cause of death for a civil case against the defendant. Id. The expert generated a report favorable to the defense, and the defense provided the State with a copy of the report. Id. Subsequently, the expert began working with the State in its prosecution of the defendant for the first degree premediated murder of the victim. Id. The defendant filed a motion to preclude the expert from testifying for the State, but the trial court denied the motion. Id. at 797. On appeal, this court stated that it had two concerns about an expert's switching sides. First, this court was concerned that an expert's joining the "prosecution team" would have a negative impact on the jury's assessment of the defendant's credibility. Id. at 800. Second, this court was concerned that allowing a defense expert to testify for the prosecution placed defense counsel in a difficult position. As this court explained,

> [A]n expert witness' switching sides and opinions after working for the defense places defense counsel at trial in the "untenable position" of both needing to accredit the expert's first opinion while simultaneously needing to discredit the expert's subsequent opinion. A focus on issues of confidentiality completely overlooks this crucial aspect of a criminal defendant's constitutional rights to counsel, to present a defense, and to confront his accusers.

Id.

Despite the court's concerns, it refused to apply a per se disqualification rule for experts who switch sides.  Id. at 798.  Nevertheless, it went on to hold as follows:

> [T]he appropriate test to be applied for assessing whether an expert witness who previously was employed as an expert on behalf of a defendant later may testify as an expert for the State on the same or substantially similar subject matter in a subsequent criminal prosecution of the defendant is whether an ordinary person knowledgeable of all the relevant facts would conclude that allowing the expert to switch sides poses a substantial risk of disservice to the public interest and/or the defendant's fundamental right to a fair trial.  Additionally, in making this determination, trial courts should consider the following nonexclusive list of factors:  (1) whether the State could have obtained a different expert witness and, if so, under what conditions; (2) whether the defendant hired the expert first in order to preclude the State from using the expert; (3) whether, in addition to switching sides, the expert switches opinions; (4) whether the expert obtained any confidential or privileged information from the defendant; (5) the expert's reasons for switching sides and, if relevant, the reasons for changing his or her opinions; (6) the significance of the issue about which the expert is testifying; (7) the terms of the prior relationship between the defendant and the expert; and (8) the timing of the expert's switching sides.

Id. at 801.  Moreover, "due process concerns mandate a presumption in favor of disqualification in criminal cases.  Unless the record demonstrates that the State clearly has rebutted the presumption in favor of disqualification, the trial court should exclude the testimony of the expert."  Id.  After analyzing the eight factors, this court held in Larkin that the trial court erred by allowing the expert to testify for the State.  Id.

Initially, we note that any concern about the jury's knowing that the expert switched sides is not implicated in the instant case because the trial court ruled that Schiro could not testify that he originally was hired by the defense.  We think, though, that defense counsel was placed in an "untenable position" by needing to accredit Schiro's opinion on cross-examination that Agent James's DNA analysis was suspect because Agent James did not test the vaginal swabs while needing to discredit Schiro's direct testimony that the DNA on the vaginal swabs matched the Appellant's DNA.

That said, we turn to the eight-factor test espoused in Larkin. The first factor is whether the State could have obtained a different expert witness. In this case, not only could the State have obtained a different expert witness, it did obtain a different expert witness, i.e., Agent James. Thus, factor one weighs in favor of disqualification. Second, whether the defendant hired the expert first in order to preclude the State from using the expert, the State acknowledges that nothing indicates the Appellant hired Schiro to preclude the State from doing so. Therefore, the second factor also weighs in favor of disqualification. Third, whether, in addition to switching sides, the expert switches opinions, the Appellant acknowledges that Schiro did not switch opinions. Therefore, the third factor does not weigh in favor of disqualification.

The fourth factor considers "whether the expert obtained any confidential or privileged information from the defendant." Although the factor specifies that the expert obtained confidential information from the defendant, the list of factors in Larkin is "nonexclusive." As a result, we see no reason why the fourth factor should not also consider whether the expert provided confidential information to the defendant.

At oral argument, the State contended that factor four did not weigh in favor of disqualification because Schiro did not obtain confidential or privileged information from the Appellant and "just tested the evidence." While we agree with the State that nothing indicates Schiro obtained confidential or privileged information from the defense, Schiro did much more than "just test the evidence" in this case. Specifically, he helped defense counsel prepare for cross-examination of the State's expert, advised defense counsel about trial strategy, aided the defense in understanding the State's case, and alerted defense counsel to weaknesses in the State's case. In particular, Schiro informed defense counsel that he found it unusual that Agent James reported "vaginal" swab results when James tested only vulvar swabs. Defense counsel then used that information during his cross-examination of Agent James to call the reliability of James's analysis into question. During the jury-out hearing, Schiro testified that he also advised the State about Agent James's reporting vaginal swab results when he tested only vulvar swabs. The work product doctrine "is based on an attorney's right to conduct his or her client's case with a certain degree of privacy, preventing the discovery of materials prepared by opposing counsel in anticipation of litigation and protecting from disclosure an adversary's 'mental impressions, conclusions, and legal theories of the case.'" Wilson v. State, 367 S.W.3d 229, 235 (Tenn. 2012) (quoting Memphis Publ'g Co. v. City of Memphis, 871 S.W.2d 681, 689 (Tenn. 1994)). Therefore, we believe the fourth factor weighs heavily in favor of disqualification.

Regarding the fifth factor, the expert's reasons for switching sides, Schiro offered no explanation for his testifying for the State other than the State asked him to. However, Schiro's explanation is suspect. During the jury-out hearing, Schiro expressed

concern about his testifying for the prosecution, stating that it was "unusual," that he had "never been put in that situation before," and that he would not testify if he did not have to. Yet, he also stated that the State was paying him for his time, and he still testified for the State despite his being under no obligation to do so. Thus, we believe factor five weighs in favor of disqualification.

Sixth, the significance of the issue about which the expert is testifying, the DNA test results were the key issue in this case. Agent James testified for the State that he was not certified by the American Board of Criminalistics, that he had contaminated samples previously, and that the DNA in the victim's rape kit matched the Appellant's DNA. Schiro then testified for the State that his DNA analysis also showed that the DNA in the victim's rape kit matched the Appellant's DNA. The State asked Schiro about the significance of a DNA analyst's being certified and his opinion regarding Agent James's contamination of the evidence, both of which were part of the defense's strategy. As a result, the State used Schiro to bolster the test results obtained by its own expert and to rehabilitate that expert. Therefore, Schiro's testimony was significant, and factor six also weighs in favor of disqualification.

Seventh, the terms of the prior relationship between Schiro and the Appellant, the Appellant obtained Schiro's services through an ex parte order. In State v. Barnett, our supreme court explained the importance of an ex parte hearing when a defendant seeks to hire a state-funded psychiatric expert: "Indigent defendants who must seek state-funding to hire [an] expert should not be required to reveal their theory of defense when their more affluent counterparts, with funds to hire experts, are not required to reveal their theory of defense, or the identity of experts who are consulted, but who may not, or do not, testify at trial." 909 S.W.2d 423, 428 (Tenn. 1995). Moreover, the trial court obviously concluded that a confidential relationship existed between Schiro and the defense, ruling that the State could not question Schiro about individual conversations he had with defense counsel or information he provided to defense counsel as part of the work product doctrine. We agree that a confidential relationship existed in this case. Schiro assisted the Appellant with various aspects of his defense, including his defense strategy. Schiro then revealed part of that strategy to the State. Thus, factor seven weighs heavily in favor of disqualification.

Finally, we are greatly troubled by the timing of the Schiro's switching sides. The State contacted Schiro while he was still was working with the defense, and Schiro continued to work with the defense while he was talking with the State. In fact, Schiro was still communicating with the defense just prior to trial. Thus, factor eight weighs heavily in favor of disqualification.

In sum, seven of the eight factors weigh in favor of disqualification, and only one factor rebuts the presumption of disqualification. Therefore, we hold that "an ordinary person knowledgeable of all the relevant facts in this case would conclude that allowing [Schiro] to switch sides and testify for the State posed a substantial risk of disservice to the public interest and to the [Appellant's] fundamental right to a fair trial." Id. at 804. The State clearly failed to rebut the presumption in favor of disqualification in this case. See id. Accordingly, the trial court erred by allowing Schiro to testify for the State.

Next, we must determine the effect of the error. A trial court's error in allowing a defense witness's expert to testify for the state is a nonstructural constitutional error. Larkin, 443 S.W.3d at 801. As such, the State must prove beyond a reasonable doubt "that the error 'did not contribute to the verdict obtained.'" State v. Climer, 400 S.W.3d 537, 556 (Tenn. 2013) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

The State argues that Schiro's testimony was harmless because he only testified that the DNA in the victim's rape kit matched the Appellant's DNA; therefore, his testimony was merely cumulative to Agent James's testimony. We disagree. As we just explained, the State not only used Schiro to bolster the DNA analysis performed by its own expert but to rehabilitate its expert. During its closing argument, the State honed in on the importance of Schiro's testimony, stating as follows:

> But, if you didn't like [Agent] James, if you wanted the defense attorney to attack [Agent] James and talk about contamination, and try to confuse you about things, ask questions that are so confusing because you don't even understand the question you're asking, yourself, well then, there's George Schiro, also.

> And, if you want to attack [Agent] James because he's not a member of the American Board of Criminalistics, which there's a total of a hundred people that are a member of that, out of thousands, some voluntary organization, well, fine.

> So, we've got George Schiro. He is the lab director of a private lab, of Scales Laboratory. He is a member, board certified by the ABC, the American Board of Criminalistics. He's been -- with experience of over thirty years, and he's testified as an expert at -- I don't even remember all the states he said. He just started rattling off states all across the country.

And, basically, what does he say in this case? The exact same thing. First of all, as far as contamination goes, he basically gives you the same explanation that [Agent] James gave you about what contamination means and how contamination occurs. Not that it's some crazy, scary thing you should worry about, that there's cross-contamination between multiple defendants. No. These things are worked isolated, and they're worked days and months apart. There is no chance whatsoever that any kind of contamination could have occurred in this case. There is no evidence whatsoever that it did.

And he told you he reviewed that work of [Agent] James, and there was no evidence whatsoever, no concerns, that there's any kind of contamination in the case.

. . . .

And George Schiro had the exact same [DNA] findings, except for, instead of the quintillions, he says that his lab, they just stop at the nine hundred and ninety-nine trillion numbers.

But he doesn't just -- he runs the vaginal swabs and the vulva swabs. So, the defense wants to attack the TBI agent. "Oh, you should have run vaginal swabs instead of vulva swabs, because the vaginal swabs, you can go deeper," or whatever explanation it was.

Well, George Schiro did both. And in the vulva swab, he got the exact same results as the TBI got. That is the Defendant's DNA. That is his sperm that was in [the victim's] vagina. And the same thing with her vaginal swabs. It's a mixture of both of them, of the Defendant and of the victim.

Therefore, we cannot conclude that the trial court's error was harmless and are compelled to reverse the Appellant's convictions.

D. Prosecutorial Misconduct

- 20 -

The Appellant claims that the State committed prosecutorial misconduct during the State's rebuttal closing argument. The State contends that the prosecutor's argument, while "silly," was not improper. We conclude that the State committed prosecutorial misconduct.

During the prosecutor's rebuttal closing argument, he stated as follows:

> One of my favorite movies is an old movie that's called "The Dead poets Society." Remember the movie "The Dead Poets Society," with Robin Williams? He plays a teacher in a prep school. He does a thing in the movie where he stands up on the desk, and he has each of the students do it. And the purpose of that is to try to see things from other perspectives.
>
> I'm asking you to do the same thing in this case. This is a rape case, aggravated rape. There are two defenses in a rape case. It wasn't me; I didn't do it. We had sex, but it was consensual.

The record reflects that the prosecutor was standing on top of counsel table at the time of his argument.

Defense counsel objected to the prosecutor's "standing on a desk as he's talking to the jurors." The trial court overruled the objection, stating, "It's closing arguments. I'll allow it." The prosecutor continued as follows:

> Those are the two defenses in a rape case. I didn't do it, or it was consensual.
>
> In this case, with [the victim] up there, a sixty-year-old woman, no, you can't go with this was a consensual sexual encounter. Right? You really can't go with, "I didn't do it," either, "It wasn't me." It's your DNA. It's your sperm that's found in her vagina.
>
> So, see things from a different perspective.

In order to prevail on a claim of prosecutorial misconduct, the Appellant must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. <u>Harrington v. State</u>, 385 S.W.2d

758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). Furthermore, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 WL 2359849, at *12 (Tenn. Crim. App. at Nashville, Oct. 21, 2004).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame

- 22 -

the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

Turning to the instant case, we note that during the motion for new trial hearing, the trial court described the prosecutor's argument as "unique, not your normal every day closing argument." The court then went on to state, "I'm sure that there are those within our profession and maybe on the Court of Criminal Appeals who think that such drama is not appropriate, but I'm not sure that I think that it's something that if it were exaggerated or carried to extremes might be inappropriate but I think he made a point."

We would describe the prosecutor's behavior as childish, not unique. We also fail to see, and the State has not explained, the point of the jury's needing to "see things from a different perspective." The facts and evidence in this case were relatively straightforward: the victim gave a factual account of a rape, the DNA from the sperm in the victim's rape kit matched the Appellant's DNA, and the Appellant's driver's license showed he lived on the same street as the victim. In our view, the prosecutor's reference to a movie that was irrelevant to the facts and then standing on counsel table was an act of showmanship calculated to inflame the passions of the jury, and we cannot fathom why he would unnecessarily risk a mistrial or reversal knowing that the victim would be forced to testify again to the horrific ordeal she experienced.

Moreover, the prosecutor's conduct showed a lack of respect for the judicial process. "A courtroom is a hallowed place where trials must proceed with dignity and not become occasions for entertainment by the participants, by extraneous persons, by modern mass media, or otherwise." Illinois v. Allen, 397 U.S. 337, 351 (1970) (Douglas, J. concurring). Therefore, we conclude that the prosecutor's standing on a table to give his closing argument was inappropriate and that the trial court erred by failing to overrule the Appellant's objection.

The State argues that any error was harmless. Given the strength of DNA evidence in identifying a defendant as the perpetrator of a crime, we ordinarily would agree. See Tenn. R. App. P. 36(b). However, we have already determined that the trial court committed reversible error by allowing the Appellant's expert witness to testify for the State. Therefore, we believe the cumulative effective of this error further necessitates a new trial.

### III.  Conclusion

- 23 -

Based upon the oral arguments, the record, and the parties' briefs, we must conclude that the trial court committed reversible error by allowing the defense's DNA expert to testify for the State. We also conclude that the State committed prosecutorial misconduct during closing arguments and that the cumulative effect of the error further warrants a new trial. Accordingly, the Appellant's convictions are reversed, and the case is remanded to the trial court for further proceedings consistent with this opinion.

_____
NORMA MCGEE OGLE, JUDGE